IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

DEXTER SHAW,                          :
                                      :
              Plaintiff,              :
                                      :
       VS.                            :
                                      :   CIVIL No: 5:12-CV-0135-CAR-MSH
HILTON HALL, *et al.*,                :
                                      :
              Defendants.             :
_____

## ORDER AND RECOMMENDATION

Presently pending before the Court is Defendants' motion for summary judgment (ECF No. 233) and Plaintiff's motion for reconsideration (ECF No. 252). For the reasons explained below, Plaintiff's motion for reconsideration is denied and it is recommended that Defendants' motion for summary judgment be granted.

## BACKGROUND

Plaintiff alleges that Defendants Steven Upton, Hilton Hall, and Carl Humphrey violated his Eighth Amendment right to be free from cruel and unusual punishment by holding him in punitive segregation for twelve years. Plaintiff is currently serving a life sentence for armed robbery, rape, aggravated sodomy, giving a false name, carrying a concealed weapon, and a violation of the Georgia Controlled Substances Act. Upton Aff. ¶ 6, ECF No. 233-3; Hall Aff. ¶ 6, ECF No. 233-4; Humphrey Aff. ¶ 6, ECF No. 233-5. Between September 2001 and April 2012, Plaintiff was housed at both Georgia State Prison ("GSP") and Georgia Diagnostic and Classification Prison ("GDCP") in

administrative segregation.[1]   Upton Aff. ¶ 7; Hall Aff. ¶ 7; Humphrey Aff. ¶ 7. Defendant Steven Upton was the warden at GSP from May 2007 to May 2009 and the warden of GDCP from June 2009 to December 2010. Upton Aff. ¶¶ 2, 27. Defendant Hilton Hall was the warden at GDCP from December 2006 to June 2009. Hall Aff. ¶ 11; *see also* Pl.'s Stat. of "Disputed" Facts ¶ 1, ECF No. 239-2. And finally, Defendant Carl Humphrey was the warden at GDCP from December 16, 2010 to July 1, 2013. Humphrey Aff. ¶ 2.

Plaintiff was first placed in administrative segregation at GSP on September 28, 2001, because he allegedly posed a threat to the safety and security of the institution. Upton Aff. ¶ 9; Hall Aff. ¶ 9; *see also* Upton Aff. Ex. 2, ECF No. 235-1; Hall Aff. Ex. 3, ECF No. 235-2. R.D. Collins, the then Deputy Warden of Security at GSP, made the initial decision to place Plaintiff in administrative segregation. Upton Aff. ¶ 10; Hall Aff. ¶ 10; Upton Aff. Ex. 2; Hall Aff. Ex. 3. The classification committee reviewed this decision and recommended that Plaintiff remain in administrative segregation until an investigation was completed. Upton Aff. ¶ 10; Hall Aff. ¶ 10; Upton Aff. Ex. 2; Hall Aff. Ex. 3. The warden, Hugh A. Smith, ultimately approved this decision and Plaintiff's placement in administrative segregation. Upton Aff. Ex. 2. While the outcome of the investigation is unclear, it appears that on December 14, 2001, the classification committee decided to place Plaintiff in "involuntary protective custody" ("IPC") and house him in administrative segregation. *See* Pl.'s Br. in Supp. of Resp. to Mot. for

---

[1] Plaintiff is now housed at Valdosta State Prison. *See* Notice of Change of Address, ECF No. 197.

Summ. J. ¶ 10, ECF No. 239-1; *see also e.g.*, Upton Aff. Ex. 4 at 2, ECF No. 235-1 (form revealing the start date of housing in administrative segregation as 12/14/01).[2]  Plaintiff's status in administrative segregation was not reviewed until February 2004.  Pl.'s Br. in Supp. of Resp. to Mot. for Summ. J. ¶¶ 23-24; *see also* Pl.'s Exs. in Supp. of Resp. Ex. 1, ECF No. 239-3.

Defendants assert that in determining whether an inmate merits continued placement in either administrative segregation at GSP or the Special Management Unit ("SMU") at GDCP,[3] they "take[ ] into consideration the security risk . . . posed to the institution . . . [and any] reports from staff members who had direct or indirect contact with [the] inmate . . . , case notes, if any, from staff members, and recommendations from the Chief Counselor, the Unit Manager, and the Classification Committee."  Upton Aff. ¶ 30; Hall Aff. ¶ 23; Humphrey Aff. ¶ 17.  Furthermore, "[w]hen assessing whether an inmate [is] a threat to the safety and security of the institution, the following things are taken into account: 1) threatening behavior toward fellow inmates, staff, and the general public; 2) the ability to carry out the stated threats; 3) the nature of the threats (i.e., threats to cause bodily harm to others; threats to cause damage to state property); and 4) threats or attempts to escape from any GDC institution."   Upton Aff. ¶ 4; Hall Aff. ¶ 4; Humphrey Aff. ¶ 4.  The warden also reviews that inmate's disciplinary report ("DR")

---

[2]  However, on a classification appeal form from August 2005, it appears that a prison official noted that Plaintiff "was placed on PCPC status 1/10/02.  He is on this status due to he [sic] not being able to adjust in gen. pop."  Pl.'s Sixth Mot. for Inj. Relief Ex. 3, ECF No. 64-3.  The official also noted that Plaintiff had 13 disciplinary reports in 2005.  *Id.*
[3]  The SMU is a "High Max Unit" designed to house "close security" inmates and is comprised of six dormitories (A Wing through F Wing), with 192 single-man cells.  Hall Aff. ¶ 15.

history, including those DRs that were dismissed on a technicality,[4] as "the circumstances surrounding the DR may still be considered by the warden . . . when making decisions that affect the security of the staff, other inmates, and of the inmates themselves."  Upton Aff. ¶ 26; Humphrey Aff. ¶ 15.[5]

It is unclear from the record the extent to which Plaintiff's status in administrative segregation was reviewed from 2001 until 2007.  After Defendant Upton became warden of GSP, Plaintiff's status was reviewed every thirty days by the classification committee, for a total of six reviews.[6]  Upton Aff. ¶ 14; *see also* Upton Aff. Ex. 4.  In all six reviews, the Classification Committee recommended that Plaintiff remain in "IPC/PCPC," stating that Plaintiff needed "structure" and "observation/adjustment."[7]  *See* Upton Aff. Ex. 4 at 1-8.  While each of these reviews point to Plaintiff's "IPC/PCPC" status, the review dated November 1, 2007 lists an additional reason: "dis seg until 4/30/2015."[8]  Upton Aff. Ex.

---

[4]  Occasionally, a DR will be dismissed where the procedural rules governing them are not followed.  *See*, *e.g.*, Upton Aff. ¶ 25.

[5]  Plaintiff contends that prison officials frequently fabricate DRs and either purposefully fail to comply with the DR procedural rules or let them expire so as to prevent investigation into the false DR while also providing evidence supporting an inmate's continued housing in segregation.  *See*, *e.g.*, Pl.'s Stat. of "Disputed" Facts ¶¶ 12-14, ECF No. 239-2; Grier Aff. ¶¶ 8-9, ECF No. 240-7.

[6]  Plaintiff's confinement was reviewed on July 30, 2007, August 29, 2007, October 1, 2007, November 1, 2007, December 3, 2007, and finally, on January 3, 2008.  Upton Aff. Ex. 4 at 1-8.

[7]  "PCPC" "denote[s] that an inmate requires a more secure environment than the standard protective custody provides because the inmate remains at risk even though housed in protective custody."  Upton Aff. ¶ 15.

[8]  Defendant Upton contends that the phrase "was intended by the Classification Committee to reiterate the fact that, to date, inmate Shaw had accumulated so much prior disciplinary segregation time that he could, absent some intervention, conceivably be in disciplinary segregation until that date."  Upton Aff. ¶ 17.  A review of Plaintiff's DR history from 2006 through 2007 reveals that a number of his DRs resulted in various amounts of time in segregation, from as few as 120 days to as many as 540 days for an infraction.  *See* Upton Aff. Ex. 8 at 3-6.

4 at 6.  Defendant Upton states that he did not write the statement, but did sign off on the recommendation.  Upton Aff. ¶¶ 16-17.  Although disciplinary segregation was still being utilized at GSP when Defendant Upton became the warden, he discontinued its use shortly after his arrival.[9]  Upton Aff. ¶ 18.  However, in June 2007, Plaintiff was adjudicated guilty at a disciplinary hearing for failure to follow instructions and insubordination.  Upton Aff. Ex. 8 at 7-8, ECF No. 235-1.  It was recommended that Plaintiff receive "30 days Store Restriction" for the failure to follow instructions and "6 mos. DISSEG" for insubordination.  *Id.*  Defendant Upton approved this decision on July 2, 2007.  *Id.* at 8.

Plaintiff transferred from GSP to GDCP on January 16, 2008 as part of a multi-inmate transfer by the Georgia Department of Corrections of maximum security, or "close security," inmates out of GSP.  Upton Aff. ¶¶ 20-21; Hall Aff. ¶¶ 12-13.  The inmates who were transferred due to their "close security" status—including Plaintiff—were automatically placed in the SMU at GDCP.  Upton Aff. ¶ 22; Hall Aff. ¶ 14.  "[T]he SMU was created for the purpose of providing close security inmates with an incentive based program to enable them to progress toward re-entry into the general prison population."  Hall Aff. ¶ 16.  Plaintiff remained at GDCP from January 2008 until May 2008, when he was transferred back to GSP for a period of six months.  Upton Aff. Ex. 1 at 4, ECF No. 235-1.

In June 2008, Investigator Stuart A. Minor began an internal investigation at

---

[9]  The exact date of discontinuation is unclear.

5

GDCP into a security breach that occurred in the SMU[10] at some point in April 2008, during which a correctional officer was stabbed.   Hall Aff. ¶ 18; *see also* Hall Aff. Ex. 5, ECF No. 235-2;[11] Pl.'s Exs. in Supp. of Resp. Ex. 17, ECF No. 240-1; Pl.'s Exs. in Supp. of Resp. Ex. 34, ECF No. 240-17.   The investigation revealed that prior to the stabbing incident, Plaintiff managed to obtain keys from the West Wing control room while being escorted to medical and prop open the control room door with his foot.   Hall Aff. Ex. 5 at 1; Pl.'s Mot. to Modify Order Ex. 2 at 1-2, ECF No. 225-4.[12]   After being altered to the breach, Lieutenant Ward rushed down the West Wing hall and instructed Plaintiff to back away and hand over the keys; Plaintiff complied.   Hall Aff. Ex. 5 at 1; Pl.'s Mot. to Modify Order Ex. 2 at 1-2.   Plaintiff then explained that he was not attempting to enter the control room, but was merely trying to get the staff's attention.   Hall Aff. Ex. 5 at 1; Pl.'s Mot. to Modify Order Ex. 2 at 1-2.   Plaintiff had previously complained about the HMU staff's repeated security breaches (e.g., officers leaving doors unsecured or leaving the keys in doors) and had informed security of an impending plot to take over the HMU. Pl.'s Mot. to Modify Order Ex. 1 at 5-6, ECF No. 225-3;[13] *see also* Pl.'s Mot. to Modify Order Ex. 2 at 1-2; Hall Aff. Ex. 5 at 2.   Plaintiff felt that his complaints were ignored. Pl.'s Mot. to Modify Order Ex. 1 at 5-6; Pl.'s Mot. to Modify Order Ex. 2 at 1-2.

---

[10]   Throughout the investigation, SMU is referred to as the "High Max Unit" or "HMU," which is another name for the SMU.  *See* Defs.' Stat. of Material Facts ¶ 53 n.1, ECF No. 233-2.

[11]   Exhibit 5 to Defendant Hall's Affidavit is the sworn statement of Lieutenant Kevin Ward to Investigator Minor and indicates that he was assigned to the High Max Unit from late 2007 until April 2008. Hall Aff. Ex. 5 at 1, ECF No. 235-2.

[12]   Exhibit 2 to Plaintiff's Motion to Modify is a sworn statement made by Plaintiff to Investigator Minor in the course of the internal investigation into the security breaches at SMU.

[13]   Exhibit 1 to Plaintiff's Motion to Modify is a sworn statement made by Unit Manager Dana Smith to Investigator Minor in the course of the internal investigation into the security breaches at SMU.

Plaintiff was not issued a DR as a result of the breach and none of the officers on duty received any adverse action prior to the internal investigation.  Hall Aff. Ex. 5 at 1-2.

Even though none of the officers on duty reported the incident, Defendant Warden Hall eventually became aware of the breach.  *Id.* at 2.   Defendant Hall questioned Plaintiff and other staff members about the incident.   Pl.'s Mot. to Modify Order Ex. 1 at 6; Pl.'s Mot. to Modify Order Ex. 2 at 2.  Although Plaintiff and Unit Manager Smith informed Defendant Hall of the plot to take over HMU, Defendant Hall took no action.[14] Pl.'s Mot. to Modify Order Ex. 1 at 6; Pl.'s Mot. to Modify Order Ex. 2 at 2. Subsequently, an inmate housed in the same dormitory in HMU breached his cell door and took another inmate hostage.  Pl.'s Mot. to Modify Order Ex. 1 at 6.  During this second security breach, an inmate stabbed a correctional officer.  Hall Aff. Ex. 5 at 1; Pl.'s Mot. to Modify Order Ex. 1 at 5-6.

From May 5, 2008 until November 4, 2008, Plaintiff was again housed at GSP. Upton Aff. Ex. 1 at 3-4.  Plaintiff was transferred back to GDCP and evaluated by the classification committee on December 18, 2008.  Hall Aff. Ex. 6, ECF No. 235-2.  The committee recommended that Plaintiff continue to be housed in SMU and that his status be reviewed in six months.  *Id.*  In June 2009, Defendant Upton replaced Defendant Hall as warden of GDCP and remained at that position until December 2010.  Upton Aff. ¶ 27. Although Defendant Upton states in his sworn affidavit that Plaintiff's status was only reviewed two times during his term as warden of GDCP, evidence before the Court

---

[14]   Defendant Hall has since stated that Plaintiff's conduct constituted a breach of security and that he believed Plaintiff was attempting to gain access to the control room so he could "pop the doors," allowing inmates out of their cells and creating a riot or disturbance.  Hall Aff. ¶¶ 20-21.

suggests that Plaintiff's status was actually reviewed (at least) five times: (1) July 2009; (2) September 2009; (3) December 2009; (4) August 2010; and (5) December 2010. *Compare* Upton Aff. ¶ 28 *and* Upton Aff. Exs. 6 & 7, ECF No. 235-1 *with* Pl.'s Sixth Mot. for Inj. Relief Exs. 7A-7E, ECF No. 64-7.  In the July 2009 report, the committee noted that Plaintiff was being housed in "L-E wing for behavior issues" and recommended continued placement in SMU.  Upton Aff. Ex. 6, ECF No. 235-1.

On September 8, 2009, Plaintiff was reclassified as close security.  Pl.'s Exs. in Supp. of Resp. Ex. 25 at 1-2, ECF No. 240-10.  Although the automated factors used in calculating an inmate's base "custody score" indicated that Plaintiff should be classified as "medium security," Defendant Upton overrode that determination.[15]  *Id.* at 2. Defendant justified this decision by noting that while Plaintiff had not had any written DRs, Plaintiff had "on 02/26/09 threatened officer/resisted removal from his cell; 04/02/08 threatened to cut counselor with razor; during past year has threatened to harm nurse."  *Id.*  Defendant Upton also cited Plaintiff's assaultive history and argumentative disposition as support for the override.  *Id.*  Plaintiff was reclassified on September 13, 2010 with similar results.  Pl.'s Exs. in Supp. of Resp. Ex. 26 at 1-2, ECF No. 240-11. Once again, despite a base score correlating to "medium security," Defendant Upton

---

[15]  An inmate's custody level or classification is reevaluated annually.  *See* Pl.'s Exs. in Supp. of Resp. Ex. 25; Pl.'s Exs. in Supp. of Resp. Ex. 26, ECF No. 240-11; Pl.'s Exs. in Supp. of Resp. Ex. 27, ECF No. 240-12; Pl.'s Exs. in Supp. of Resp. Ex. 28, ECF No. 240-13.  Based on factors such as the severity of the offense the inmate is incarcerated for, the inmate's history of escape or attempts to escape, history of institutional violence, age, frequency of DRs in the past 12 months, and programs the inmate completed while incarcerated, an automated score is calculated that indicates what custody level the inmate should be classified as.  *See*, *e.g.*, Pl.'s Exs. in Supp. of Resp. Ex. 25 at 1.  However, the re-classification process also provides for both non-discretionary and discretionary factors that either require or permit the warden to override the automated score and thereby place the inmate in a higher custody level.  *See*, *e.g.*, *Id.*

overrode that determination, noting Plaintiff's two written DRs in the past year and stating that Plaintiff also had "[o]ne additional disciplinary report dismissed due to time lapse, not finding of not guilty." *Id.* at 2. Defendant also pointed to Plaintiff's "[s]ubstantial [history] of serious disciplinary reports" and his argumentative nature as reasons for the override. *Id.*

Defendant Humphrey replaced Defendant Upton as warden of GDCP in December 2010. Humphrey Aff. ¶ 2. He served in that position until July 2013. *Id.* Prior to filing this action, Plaintiff's status was reviewed three times during Defendant Humphrey's term as warden: (1) February 2011; (2) August 2011; and (3) May 2012.[16] Humphrey Aff. ¶ 11; Humphrey Aff. Ex. 2, ECF No. 235-3; Pl.'s Sixth Mot. for Inj. Relief Exs. 9A-9E, ECF No. 64-9. In all three reviews, the committee recommended that Plaintiff remain in SMU and that his status be reviewed again in six months. Humphrey Aff. Ex. 2. In the final two reviews, the committee noted Plaintiff's disciplinary history over the last 12 months, which included two allegations of causing a fire, five allegations of failure to follow instructions, instances of threatening someone with an item or weapon, and a number of other infractions. Humphrey Aff. Ex. 2 at 3-6.

On April 12, 2012, Plaintiff filed this action. (ECF No. 1.) After preliminary review, the Eighth Amendment claim alleging that twelve years in punitive segregation amounted to cruel and unusual punishment was permitted to proceed, with the limitation that those "claims based upon the conditions of his confinement prior to April 14, 2010"

---

[16] Plaintiff's status was reviewed two additional times while Defendant Humphrey was the warden, but after Plaintiff filed the instant action. *See* Pl.'s Sixth Mot. for Inj. Relief Exs. 9A-9D, ECF No. 64-9.

be dismissed as "generally time barred."  R. & R. 4, July 17, 2013, ECF No. 40.  Plaintiff filed objections to the Recommendation, expressing confusion over which portions of the twelve year confinement would be time barred.  Pl.'s Objs. 2-3, ECF No. 44.  In its Order adopting the Recommendation, the Court explained that "[b]ecause Plaintiff alleged that the unconstitutional conditions of confinement at Hi-Max (occurring between 2008 and 2010) continued into the limitations period, those claims were allowed to go forward." Order 6, Oct. 9, 2013, ECF No. 77.   The Court also explained that any contention that "his confinement at GSP constitutes a 'continuing violation' is . . . without merit. Plaintiff was not subjected to the conditions at GSP after 2008."  *Id.* at 7.  However, "[e]ven though Plaintiff's GSP claims may no longer be actionable, the duration of his prior confinement in punitive segregation may be relevant in determining whether his continued confinement in these extremely restrictive conditions is constitutional."  *Id.*

On March 20, 2015, Defendants filed a motion for summary judgment.  (ECF No. 233.)  Plaintiff filed a response in opposition (ECF No. 239) and corresponding exhibits (ECF No. 240).  Plaintiff also filed a motion for reconsideration (ECF No. 252) of the Court's Order filed on August 11, 2015 (ECF No. 251).  These motions are now ripe for review.

## DISCUSSION

## I.    Defendant's Motion for Summary Judgment

A.     Standard of Review

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a).  In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit.  *Id.* at 248.  A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party.  *Id.*

   B.   Failure to State a Claim

   Defendants contend that the uncontested facts show that no Eighth Amendment violation occurred here. Mot. for Summ. J., ECF No. 233; Br. in Supp. of Mot. for Summ. J. 6-8, ECF No. 233-1.  "The Eighth Amendment prescribes punishment that shocks the conscience, offends society's evolving notions of decency or is grossly disproportionate to the offense . . . [or] inflictions of pain which are totally without penological justification."  *Sheley v. Dugger*, 833 F.2d 1420, 1428 (11th Cir. 1987) (internal quotes and citations omitted).  While confinement in segregation does not by itself constitute cruel and unusual punishment, "the length of confinement cannot be ignored in deciding whether the confinement meets constitutional standards."  *Hutto v. Finney*, 437 U.S. 678, 686 (1978).  "Although prisoners do not shed all constitutional rights at the prison gate, . . . lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system," and "[u]nder certain circumstances, administrative segregation is a necessary limitation of privileges and rights that incarceration demands."

*Al-Amin v. Donald*, 165 F. App'x 733, 738 (11th Cir. 2006) (internal quotation marks and citation omitted).   However, the Eleventh Circuit has held that a "twelve-year confinement in [segregation] raises serious constitutional questions[,]" even where the conditions of confinement in and of themselves do not violate the Eighth Amendment.[17] *Sheley*, 833 F.2d at 1429.  In *Sheley*, the Eleventh Circuit ultimately remanded the case to the district court for an evidentiary hearing to determine, in part, whether the segregation was punitive and further that "[i]f the segregation is punitive, it should be determined whether it shocks the conscience, is grossly disproportionate to the offense, or is totally without penological justification."[18]   *Sheley v. Dugger*, 833 F.2d 1420, 1429 (11th Cir. 1987).

Plaintiff contends that like in *Sheley*, he has been held in punitive segregation for over 12 years and that confinement is totally without penological justification.   *See generally* Recast Compl., ECF No. 33.  Defendants, while seemingly conceding that the segregation is punitive in nature, contend that such confinement is not wholly without penological justification.  Br. in Supp. of Mot. for Summ. J. 6-8; *see also* Defs.' Reply Resp. 7-10, ECF No. 244.  Defendants collectively contend that each Defendant has sufficient penological justification for their separate decisions to continue to house Plaintiff in SMU.  Defendant Upton contends that during his tenure as warden at GSP, he

---

[17] Here, as in *Sheley*, "even when considered collectively, Plaintiff's conditions [of confinement] do not evidence 'extreme' deprivations, as required to state an Eighth Amendment claim."  R. & R. 31, May 19, 2014, ECF No. 168.

[18]   Although not addressed by either party, the petitioner in *Sheley* filed a motion for habeas relief, seeking release from punitive segregation.  *Sheley*, 833 F.2d at 1423.  *Sheley* is thus not directly applicable to this case since Plaintiff seeks monetary damages instant to his section 1983 civil action.  Recast Compl. 39-41, ECF No. 33.

had sufficient penological justification to continue to house Plaintiff in administrative segregation based on the recommendations of the classification committee and Plaintiff's DR history.  Defs.' Reply Resp. 7.  Defendant Hall argues that, because of Plaintiff's automatic transfer into SMU based on his prior classification as a "close security" inmate and in light of Plaintiff's security breach in April 2008, he had sufficient penological justification for assigning Plaintiff to SMU.  Defs.' Reply Resp. 8-9.  Finally, Defendant Humphrey contends that the severity and number of Plaintiff's DRs together with the continued recommendation of the classification committee provide sufficient justification.  *Id.* at 9-10.

Plaintiff responds that the segregation is wholly punitive and without any justification apart from Defendants' desire to unconstitutionally retaliate against him for exercising his rights.  *See*, *e.g.*, Pl.'s Br. in Supp. of Mot. to Am. Resp. 4-5, ECF No. 247-1.  Plaintiff avers that (1) Defendants fail to establish that his confinement from 2001 to 2007 was at all justified; (2) that from 2007 to 2008 Defendant Upton knowingly continued to impermissibly hold him in disciplinary segregation; and (3) that all three Defendants continued to house him SMU for purely retaliatory reasons and have fabricated DRs to support their post hoc argument that penological justifications existed.  *See* Pl.'s Br. in Supp. of Resp. to Mot. for Summ. J. ¶¶ 4-7, 10-21, 23-28, 30-36, 41-47, 49-61, ECF No. 239-1.  Plaintiff notes in support: (1) GSP's previous policy of permitting disciplinary segregation; (2) the conspicuous absence of several pieces of evidence, such as additional classification committee reviews and the results of the initial 2001 investigation that first landed Plaintiff in administrative segregation; (3) the fact that

Plaintiff's status was not reviewed while at GSP until 2004 and was, at best, sporadically reviewed until Defendant Upton became warden in 2007; (4) Defendant Upton's sanction of the use of disciplinary segregation in the July 2007 disciplinary hearing; (5) Defendant Upton's approval of the November 2007 committee's recommendation that included a note stating that Plaintiff should remain in administrative segregation because, among other reasons, Plaintiff had accumulated enough disciplinary segregation days ("dis seg") to be held in segregation until April 30, 2015; and (6) the fact that Defendant Upton mislead the Court in a sworn statement as to the number of classification reviews that took place during his tenure as warden of GDCP.  *See generally* Pl.'s Resp. to Mot. for Summ. J.

The Court previously held that Plaintiff's confinement at GSP from 2001 to 2008 does not constitute a "continuing violation" and dismissed this claim with prejudice. Order 5-8, Oct. 9, 2013, ECF No. 77; *see also* R. & R. 4-5, July 17, 2013, ECF No. 40. Although the Court considers "the *duration* of his prior confinement in punitive segregation," the entire twelve-year period is only relevant for purposes of "determining whether his *continued confinement . . .* is constitutional."  Order 7, Oct. 9, 2013, ECF No. 77 (emphasis added).   Whether Plaintiff's confinement from 2001 until 2008 is constitutional is thus not germane to this action.[19]

The only relevant inquiry is whether "Plaintiff has been held in punitive segregation for twelve years causing mental and physical deterioration" without

---

[19]   Furthermore, even if the Court were to analyze whether Plaintiff's confinement from 2001 until 2007 was constitutional, Plaintiff fails to state a claim against the current Defendants because they were not wardens at GSP during that time period.

penological justification, in violation of the Eighth Amendment.  R. & R. 33, May 19, 2014, ECF No. 168.  Given the severity of Plaintiff's 2008 security breach (whether Plaintiff intended it as a wake-up call or as a means to start a riot), Plaintiff's extensive DR history, Plaintiff's status as a "close custody" inmate, and the GDCP classification committees' independent reviews and continued recommendations that Plaintiff should be housed in SMU, it cannot be said that Defendants' decisions to house Plaintiff in SMU from 2008 until 2012 were totally without penological justification.  *See Turner v. Safley*, 482 U.S. 78, 89-91 (1987) (stating that when determining whether a challenged restriction is "reasonably related to legitimate penological interests," a court should look to the existence of a "valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; "alternative means of exercising the right that remain open to prison inmates"; "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and "the existence of obvious, easy alternatives [which] may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns"); *see also Hutto*, 437 U.S. at 686 n.8 ("[T]he Constitution does not require that every aspect of prison discipline serve a rehabilitative purpose").  Plaintiff thus fails to state a claim and it is recommended that Defendants' motion for summary judgment be granted.

    C.    <u>Qualified Immunity</u>

    Defendants also contend that they are entitled to qualified immunity.  "Qualified immunity protects government officials performing discretionary duties from suits in

their individual capacities unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Anderson v. City of Naples*, 501 F. App'x 910, 915-16 (11th Cir. 2012) (internal quotation marks and citation omitted). "The purpose of qualified immunity is to allow officials to carry out discretionary duties without the chilling fear of personal liability or harrassive litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating federal law." *McCullough v. Antolini*, 559 F.3d 1201, 1205 (11th Cir. 2009) (internal quotation marks and citation omitted).

"In order to receive qualified immunity, an official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful acts occurred." *Id.* Once the defendant shows that he or she was acting within her discretionary authority, the burden then shifts to the plaintiff to establish that qualified immunity does not apply. *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2004). There is no question that Defendants were acting within their discretionary authority. *See, e.g., Holloman ex. rel Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004) (explaining that a government employee is acting within his discretionary authority when he "was (a) performing a legitimate job-related function . . . , (b) through means that were within his power to utilize[]"). Because that determination is made, the burden then shifts to Plaintiff to show that the Defendants are not entitled to qualified immunity.

"To overcome an official's claim of qualified immunity, the plaintiff must show that: (1) the official violated a constitutional right; and (2) that right was clearly established at the time of the alleged violation." *Anderson*, 501 F. App'x at 916 (citation

omitted).[20]   The Court therefore must determine whether the Plaintiff has sufficiently alleged that the defendant's conduct violated a constitutional right and whether that right is clearly established.   Even assuming that Plaintiff has sufficiently alleged a constitutional violation, which as explained above the Court declines to find, such constitutional violation is not clearly established.

"To be clearly established, a right must be sufficiently clear that every reasonable official would [have understood] that what he is doing violates that right."   *Reichle v. Howards*, -- U.S. --, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted) (alteration in original).   "In other words, existing precedent must have placed the statutory or constitutional question beyond debate."   *Id.* (internal quotation marks and citation omitted).   The Eleventh Circuit has explained that

> [a] right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law.

*Maddox v. Stephens*, 727 F.3d 1109, 1121 (11th Cir. 2013).   Furthermore, "[t]he inquiry whether a federal right is clearly established must be undertaken in light of the specific context of the case, not as a broad general proposition."   *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal quotation marks and citation omitted).   "The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [state official] that his conduct was unlawful in

---

[20] Courts should use their discretion in determining which prong of the qualified immunity inquiry to address first.   *McCullough*, 559 F.3d at 1205.

the situation he confronted." *Id.* (quotation marks and citation omitted) (emphasis and alteration in original).  The court should look "only to binding precedent—cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose—to determine whether the right in question was clearly established at the time of the violation." *Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (citation omitted).

There is no law, case law or otherwise, that establishes that twelve years in administrative segregation, in and of itself, constitutes cruel and unusual punishment. *See Hutto*, 437 U.S. at 686.  While the Eleventh Circuit has held that "twelve-year confinement in [segregation] raises serious constitutional questions," there is no case law addressing whether a warden's decision to keep an inmate in administrative segregation is "totally without penological justification" where that decision is based on the inmate's "close custody" status, his history of assaultive DRs, a previous security breach, and numerous classification committees' recommendations that the inmate remain in a high max unit.  "Prison administrators . . . should be accorded wide-ranging deference in the . . . execution of policies and practices that in their judgment are needed . . . to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979); *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (citing *Bennett v. Parker,* 898 F.2d 1530, 1533 (11th Cir. 1990)).  Furthermore, although case law has not addressed what might constitute sufficient penological justification in this situation, Defendants' decisions to continue to confine Plaintiff does not, under these circumstances, amount to "conduct so egregious that a constitutional right was clearly violated, even in the total absence of case law."

*Maddox v. Stephens*, 727 F.3d at 1121.  It is thus not clearly established that Defendants'
actions in this case violated any constitutional right, and they are entitled to qualified
immunity.  Defendants' motion for summary judgment should therefore be granted.

## II.     Plaintiff's Motion for Reconsideration

On August 18, 2015, Plaintiff filed a motion for reconsideration (ECF No. 252) of
the Court's Order filed on August 11, 2015 (ECF No. 251).  In that Order, the Court
denied Plaintiff's then pending motions for the Court to appoint an expert witness on
Plaintiff's behalf (ECF No. 226); to stay the proceedings in this case (ECF Nos. 246 &
248);[21] and finally to amend Plaintiff's response to Defendants' pre-answer motion to
dismiss (ECF No. 247).   Order 1-6, Aug. 11, 2015, ECF No. 251.  In the present motion
for reconsideration, Plaintiff only takes issue with the Court's denial of the motions to
stay and the motion to amend.  Pl.'s Mot. for Recon. 1-6, ECF No. 252.

A motion for reconsideration can only be granted where the moving party shows
either: "(1) there has been an intervening change in the law; (2) new and previously
unavailable evidence has been discovered through the exercise of due diligence; or (3)
the court made a clear error of law."  *McCoy v. Macon Water Auth.,* 966 F. Supp. 1209,
1222–23 (M.D. Ga. 1997).  However, "[a] motion for reconsideration does not provide an
opportunity to simply reargue the issue the Court has once determined."  *Pennamon v.
United Bank*, No. 5:09-CV-169 (CAR), 2009 WL 2355816, at *1 (M.D. Ga. July 28,

---

[21] In the motions to stay, Plaintiff argued that the Court should not rule on Defendants' motion
for summary judgment until it issued a ruling on a previously filed motion for reconsideration
(ECF No. 242).  *See* Pl.'s Mot. to Stay 1, ECF No. 246.  The Court has since denied Plaintiff's
prior motion for reconsideration.  Order 1-2, Nov. 20, 2015, ECF No. 253.

2009) (quotation omitted).  Plaintiff has shown no change in the law, no new evidence, and no error in the consideration or determination of his motions.  Plaintiff's arguments supporting reconsideration of the denial of his two motions to stay amount to mere recitations of previously considered and rejected arguments.[22]

Although Plaintiff's contention that the motion to amend was wrongfully denied does not merely attempt to reargue previous issues, it is likewise meritless.  Plaintiff states that in filing his motion to amend, he sought leave to amend his response to Defendants' *motion for summary judgment*.  Pl.'s Mot. for Recon. 5.  However, Plaintiff entitled that motion as a motion to amend his response to Defendants' *motion to dismiss*.  *See* Pl.'s Mot. to Am. Resp. to Mot. to Dismiss 1, ECF No. 247; Pl.'s Br. in Supp. of Mot. to Am. Resp. 1, ECF No. 247-1.  Denying Plaintiff leave to amend a response to a motion that has already been decided is not clear error and therefore his motion for reconsideration is denied.[23]

To the extent Plaintiff seeks leave to amend to his responses to Defendants' motion for summary judgment, such a motion is denied.  Plaintiff already filed an extensive response to the motion for summary judgment (ECF No. 239), a number of exhibits related to his response (ECF No. 240), and a memorandum in support of his response (ECF No. 241).  Moreover, Plaintiff did not seek leave to file a sur-reply brief in response to Defendants' reply (ECF No. 244) in accordance with Local Rule 7.3.1(C).

---

[22] Additionally, Plaintiff's motions to stay until the Court issues a ruling on Plaintiff's previous motion for reconsideration (ECF No. 242) are now moot.  Order 1-2, Nov. 20, 2015, ECF No. 253.

[23]  The motion to dismiss had already been ruled on by the Court.  *See* Order, Aug. 28, 2014, ECF No. 181.

But even overlooking Plaintiff's non-adherence to the local rule, any motion to amend his response to Defendants' motion for summary judgment is denied as futile because as discussed above, the Court finds Plaintiff's responses to Defendants' motion for summary judgment to be unpersuasive.

## CONCLUSION

For the reasons explained above, Plaintiff's motion for reconsideration is denied (ECF No. 252) and it is recommended that Defendants' motion for summary judgment (ECF No. 233) be granted.  Pursuant to 28 U.S.C. § 636(b)(1), the parties may serve and file written objections to this Recommendation, or seek an extension of time to file objections, within fourteen (14) days after being served with a copy hereof.  The district judge shall make a de novo determination of those portions of the Recommendation to which objection is made.  All other portions of the Recommendation may be reviewed for clear error.

The parties are hereby notified that, pursuant to Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."

SO ORDERED and RECOMMENDED, this 8th day of January, 2016.

/s/ Stephen Hyles
UNITED STATES MAGISTRATE JUDGE